Good morning ladies and gentlemen and welcome to the 9th Circuit Court of Appeal. We will hear the cases in the order on which they appear on the day sheet. The first three cases, Carrero Bueno v. Barr, Voltermeyer v. Century Link, and Belloso Delgado v. Barr are all submitted. So the first case we will hear on the calendar is Johnny G. Mack v. Town of Pinetop Lakeside. Good morning, Your Honors. Scott Moss for Plaintiff Appellant. Johnny Mack, I'd like to reserve five minutes for rebuttal. Keep an eye on the clock. We won't remind you. Thank you. Your Honors, in this case the district court held that the alleged hostile work environment was limited to just four slurs and that four isn't enough for a hostile work environment. We believe that's incorrect due to four legal errors. First, the district court excluded non-expressly racial incidents of hostility, even though a jury could find that this hostility and these incidents were by the slur users and those who condoned the slurs, and therefore the jury could find they were part of the racially hostile work environment, as well as that retaliatory and racial incidents are part of the same environment. Do you have any authority for the idea that it's a legal error not to consider non-racial slurs along with racial slurs to determine whether racial slurs were made? Yes, that they're part of the same environment. In Reynaga v. Roseburg from this circuit in 2017, the plaintiff was Mexican-American and claimed there were slurs against not only Mexican-Americans but Arab-Americans, Native Americans that counted, but also there was non-racial bullying that was part of it because the jury could conclude these were separate things, but the jury could conclude that when those who use slurs express other hostility, it's the same motivation. Are you relying on Reynaga? I was on the panel with Reynaga. Any other cases? Sure. In McGuinness v. GTE, which we see as the most on-point case because it was about the same slur, the N-word, we'll call it, there, most of the harassment was several uses of that slur within a year. Only one said directly to the plaintiff, others just graffiti, but there were other non-racial, the main non-racial incident was denying the plaintiff maintenance on his vehicle, which created a safety risk. And that's not expressly racial, but the court said that because it's by the same person who used the slurs, a jury could choose to infer that this is part of the hostile work environment. And after all, many harassment cases, whether race or gender or what have you, it's not just sexual or racial. It's hostility to the group. Because the gravamen isn't that Title VII or 1981 is a civility code. It's that you're treating people worse in the group. We're not claiming that this is just about incivility. This is about treating Johnny Mac much worse because he's African American and dared complain. But what non-racial slurs or incidents are you talking about that the court could have considered but did not consider? Yes, two answers, Your Honor. First, in addition to the slurs, and we dispute the number with the district court, there were three threats to plaintiff's job. One, screamed by his supervisor. Two others, the mayor and town manager telling him he'll be fired if he complains again. And the snake incident. So there are four non-expressly racial things. I think he was remonstrated because he didn't go through the proper channels, right? Correct. And that's what we believe. That should be considered as a racial slur by Mr. Patterson? Oh, no. That's not a racial slur. Correct. I agree. That's not a racial slur, Your Honor. It's that job threats, when they are intimidating and a threat to be fired for something that was not actually wrong, are an expression of hostility. Why is it wrong in a bureaucracy not to go up through the channels? Because every other town official said he did nothing wrong. The next town manager, Leah Chavez, and the city councilor, Leah Venetian, who wrote the policy, said there's absolutely nothing wrong with Johnny Mack saying, I didn't get redress from town manager Reset. So I'm telling the city council, this is a small town where everyone had an open door. And the city councilor who wrote the policy and the next town manager said there's nothing wrong with what he did. This was just town manager Reset being upset that Johnny Mack snitched on her to the town council and that she wasn't redressing racial slurs and that town manager Reset was. There was no adverse employment action against him at that point, did she? Correct. We're not claiming that the job threats are adverse actions, correct. We're just claiming they're acts of hostility that rolled in with 8 to 15 racial slurs. If you have that many slurs plus three job threats plus the snake incident, which we see as highly severe, then in total you have 12 to 19 incidents in about a year and a number of them are highly severe. And I'd like to elaborate, if I could, that we believe there were— We're really only talking about the hostile work environment claim. Correct. Because we believe there's a hostile work environment. We also allege that the snake was an adverse employment action, not the threats. Your Honor was correct. We're not saying the threats are independently adverse actions. But could subjecting someone in poor health to his greatest phobia deter protected activity? It wasn't an employment action because it wasn't done by a supervisor or anybody above him. It was done by his co-worker. Correct. Well, we think the supervisor was complicit, but Your Honor is correct. It's not an employment action. So we don't allege the snake was a discriminatory adverse action, just retaliatory, because under Burlington Northern v. White from the Supreme Court, an adverse retaliatory action need not be employment-related, just something that would deter protected activity.  Threats that cause an employee to fear for safety easily exceed the reasonably likely to deter standard. So, yes, it's not an employment action, so we can't allege the snake is discriminatory adverse action, but we can allege it's a retaliatory adverse action, because would this sort of vicious attempt to incite a panic in someone known to be in ill health deter protected activity? Well, it did. So we believe that this is easily something that could indicate. Evidence that the co-worker knew that your client was in ill health. Because he was at deposition they were asked. They knew he was much older. They knew he was many pounds older. Old doesn't mean the term bad health. Oh, no, of course. You're talking to the wrong guy for that. Every day myself, Your Honor. I mean, not to suggest he's old. No, but he was. That's the least of it. He was much older than they were, but more importantly, they knew he was something like 40, 50 pounds overweight, a smoker, generally in ill health. And the most important thing is that they knew that a snake was a high-level phobia of his. These are folks on a road crew. They knew what was upsetting or disgusting. That goes to your intentional infliction of intentional emotional harm. Let's get back to your racial slurs. Yes, Your Honor. Oh, just to clarify, though, we are saying that the snake is part of the hostile environment, too, because Mack alleged it was racial as well as retaliatory. And they inflicted this offensive physical conduct because they knew it would cause this high-level panic. Whether or not they knew it was a heart attack, they knew it was going to cause a deep panic attack. And they admit they did this to frighten him because they knew of the phobia. And further on Your Honor's prior question, the main perpetrator, Davis, had EMT, medical technician training. So he admitted knowing that Mack would have a higher risk of a heart attack. Whether they intended that or not, they intended a upsetting, distressing panic. Where in the record is an admission by Davis that he knew that Mack had a heightened risk of a heart attack? Davis, it's in record pages 1161 to 62. Davis had EMT training. He estimated Mack was 60 pounds overweight and in poor health. He agreed poor. And he agreed that his condition, that Mack's condition physically put him, quote, at risk of a heart attack. He knew that. So it was foreseeable whether or not the intent, but in a hostile work environment claim, subjecting someone to physical risk, even if it's just reckless, not intentional or foreseeable, is enough. In McGinnis v. GTE again, one of the facts that the Ninth Circuit said weighed heavily, in addition to the N-word slur, they denied him vehicle maintenance, even though they knew he did a lot of highway driving. So is denying maintenance normally highly offensive? No, but if you know you're subjecting someone to physical risk by this action, that's the intent and the effect that matters. They knew they're inflicting risk. You've made your argument as it relates to the snake. What about these comments that your client didn't even know about? How are you going to get that into the hostile work environment? Two answers, Your Honor. One is there's only one of those. That's when Serrano, the coworker, told Mack. I understand how many there are, but I guess I'm trying to figure out what case you're going to rely on when the guy doesn't even know about this stuff to suggest its hostile work environment to him. Well, I think that when you learn that the perpetrator, the supervisor, Patterson, who had used slurs in the past, then after a year he's still doing it, that goes to the fact that this is continuing. Does he know that? He did. Serrano testified that when he told Mack, Patterson said the N-word again, that Mack shook his head sadly. And in Johnson v. Riverside, Ninth Circuit 08, this is on page 27 of our opening brief, the hostile work environment included offensive incidents directed at others that the plaintiff learned only later. It would be a different case if Mack never heard it. And it is why? Why is it? Just because it's relevant to the fact that there might be one? Is that the only reason you let it in? Well, the district court excluded that one. We think it's relevant because it showed Patterson wasn't stopping. That was one that occurred late in the game after a year. But of the 8 to 15 slurs, that's the only one he heard about secondhand. But when you heard this supervisor, your supervisor, who laughed at the snake incident and started the slurs, is still going even after this. I don't know whether we have laughed at the snake incident, whether he turned his back on it. I believe in the record it's that there was laughter because Patterson was watching the incident through, yes, it was Davis and Meddy, the other slur user that laughed. Right. And Patterson was seeing it through. Well, Patterson knew it was going to happen and turned his back and said, I want no part of this. That's the only thing I knew he did. I apologize. I just dug it up. It's page 1070 to 71 of the record. And that says what? Well, Your Honor's correct that when the snake incident was hatched a day earlier, Patterson turned his back and said, I want no part of it. Okay. But the day of when it happened, Mack testified, and this is on page 11, the bottom of page 10 of our opening brief, that Mack testified that Davis, quote, went into the office where Matt Patterson was and you could hear both of them laughing. Because there's testimony that Patterson had this big office window and Mack was in front and they could see each other. So Patterson and Davis were laughing as it happened or right after it happened. We don't even know why. That's true. And that's a question of fact. And that's one of those examples of how the ---- The problem comes in that I'm trying to put this in perspective as to whether it's really going to make a difference, and that's why I wanted to be sure about what facts you're putting in front of me. Correct, Your Honor. And that is in the record that they were seen to be laughing while watching the snake. So a jury could infer ---- The plot isn't so. The E saw them laughing after the snake incident happened. That's the best you can say. Correct. But they were facing him, too. So correct that a jury could infer different reasons for laughter. I appreciate you want to infer as much as you can out of this. I'm just trying to keep it specific as to what's in the record. Understood. So it's in the record that they were facing him and laughing as it happened. So that's all we're saying is that a jury could infer that it's what they were seeing that made them laugh. But as to the number of slurs, I think Your Honor asked me to get back to, we think the record is that they're 8 to 15, because the district court acknowledged Patterson said four. We think the one Serrano relayed that Patterson's still doing it is a fifth. Davis then admitted at his deposition that I said them up to five times around Mack. If it's just one time, that's okay. Amedi said it a couple times to five. That's at least two. So we have, if you add that up, at least 8 to 15 that were, that Mack heard of at the time, only one. But weren't people testifying to one slur that multiplies the number of slurs? No, no, no. We're just saying, Your Honor, that Patterson said five. It's in the record. Davis said that he said himself one to five, Davis, and Amedi said two to five. If you add five, one to five, and two to five, that's 8 to 15. And we think that's on all fours with McGinnis, where it was the slur was said only one time to the plaintiff. Other slurs were said, were just graffiti. That is — You want to save a minute? Because you've gotten into your last minute. I'll save a minute. Thank you, Your Honor. Thank you, Your Honors. May it please the Court, my name is Justin Pierce, and I'm here on behalf of the defendants in the case. And I want to start where the Court kind of left off as it pertains to the facts of the  The facts of the snake incident. When Johnny Mac testified that he saw Matt Patterson and David Davis laughing, it was after the incident had happened, because Davis was present when it happened. Matt Patterson had already gone back to the office, and what he said was that he looked through and could see the two of them talking and laughing. So this is minutes later, obviously, because Davis has to have time to go over to the office, and of course he has no idea what they're talking about. And both those individuals testified that that was not what they were laughing at. Well, the problem I have is we're here on a motion for summary judgment, right? So I have to construe all the evidence here against your client. Correct. And so, therefore, I have to go through and I have to find out just exactly what the situation is and whether, based on what's here, one could go to trial. Not whether one's going to win. Giving every benefit of the doubt to the plaintiff. Right? Yes, Your Honor. Tell me why, with what Mr. Patterson, the supervisor, it doesn't seem to me that anybody disputes that the plaintiff was subject to verbal conduct of a racial nature. It doesn't seem like they dispute the conduct was unwelcome, and I'm still on work environment here. Now we're only whether it's sufficiently severe or pervasive. So when we get to sufficiently pervasive or severe, then I look Ray Naga straight in the face and it says, the plaintiff must show the existence of a genuine factual dispute as to the workplace conditions were sufficiently severe. So I guess I'm saying to myself, there are four at least incidents relating to this supervisor, and I'm trying to figure out why, if I give every benefit of the doubt to the plaintiff, that wouldn't at least get that person a summary judgment. Judge Smith, I appreciate that. That is a critical question here because I'm glad that they've acknowledged McGinnis is kind of the most on-point case. Yes. Identifying a slew of significant racial conduct. The undisputed evidence is that is not the case here, and I'm going to point to a couple of things in the record as to why. First, right out of the gate at Johnny Mac's deposition, and if you look at his complaint, his first amended complaint, his second amended complaint, they all start with the comment, this case involves the city of Pinetop approving the placement of a snake, et cetera. Right out of the gate in his deposition, I asked Johnny Mac if that was really what this case was about. Exactly. We're here today because a snake was put in the sweeper truck, correct? He answers yes. Then my critical question to him, is it fair to say that if that event had never happened, we wouldn't be here? He said yes. He acknowledged this. Well, that's good cross, but I'm taking every benefit of the doubt in his favor, and with the four comments that were made that this supervisor was involved with, I'm having a tough time understanding why that isn't enough to get past summary judgment. Because, Judge Smith, the context matters in this court and our Supreme Court. Well, I understand the context, but I know what this supervisor said four times. Right. What he said four times was, and what the cases say is that the context of where those comments are made and how they're made matters. If he's calling him that name, we're probably not here today arguing this case. I'm having a tough time how one can have this particular plaintiff in front of him and start talking about in-rigging. Nobody is going to defend the use of the term, but that's the first step in a hostile work environment analysis. All I'm trying to say is we're now on hostile work environment, and I've got the racial nature of it. I've got the conduct was unwelcome. All I've got away now is whether it's sufficiently severe or pervasive. Correct. And now I'm saying this is not sufficient. Four times? And I would say that is right, Your Honor, and the reason is. So four times is okay? It's not okay, but it's. No, but I'm trying to say why isn't it up to the jury to say whether it's sufficiently severe? Because it does not rise to the level of severe or pervasive under law. Because our Supreme Court in this court has said we cannot turn Title VII into a workplace civility code, and, yes, it's inappropriate. He shouldn't have said those things, but he said it once in 2015, or twice is what was reported. When it's finally reported and it goes back to Matt Patterson, Reset goes to Matt Patterson and says, hey, I was told that you said this, you were fixing a machine, you said this thing. He didn't run for it. He didn't hide from it. He said, oh, shoot, yeah, it's a term I grew up hearing. I thought it just was how you fix something when you run it together. And what he says is, okay, hey, I get it. He's warned. We don't have another incident, Your Honor, for a year. Sounds like good cross. It doesn't sound like something. Mr. Pierce, let me ask you a question. Is your position that the affidavits and depositions put in by the plaintiff, that these remarks were unwelcome, is contradicted by the sworn testimony of the plaintiff at his deposition, as you started off saying, if it hadn't been for the snake, we wouldn't be here, so that those four statements of using the N-word were not unwelcome to him under oath at his deposition? Certainly there is. Because we have some cases that say the plaintiff cannot move on summary judgment on basis of affidavits saying I was hurt when at his deposition he said I was not hurt. Correct, Your Honor. The deposition trumps the affidavits. Is that your position? That's a part of it, Judge Bea, because at his deposition he made it very clear. I said there were a couple of things. One was that he said this is about the snake incident. But the second was when I asked him, because I needed to find out what's the universe we're talking about. We need to know Johnny Mac's story, not his lawyer's story of it's 8 to 15, it's this, it's what does Johnny Mac say? And Johnny Mac said in no uncertain terms that. Well, frankly, it seems to me that if you're going to use Johnny Mac's story, you've got to suggest that it is absolutely contrary to what is otherwise in the record in order for Judge Bea's cases to have any effect. And when I read the comments he made at his deposition, I'm not sure they're absolutely contrary. And therefore, if I add the four comments Patterson did, and I add comments that were not made while Mac was there, but just relayed to Mac. They weren't there. They were. And then I read Johnson v. Riverside Healthcare System, which your opposition cited to me, and it wasn't anyone who suggested what the language was appropriate there, but it was O'Scanlan who would be generally on the other side of this issue. I say to myself, how do I get past, how do I say this survives on a summary judgment standard? Because, Your Honor, if this would definitely be turning Title VII into a general workplace civility code, because it's always going to be. I guess I don't know if I find that exactly true, because McGinnis says the required level varies inversely with the pervasiveness of frequency. And, frankly, I'm not sure this isn't enough for being pretty frequent and pretty pervasive. Your Honor, over the course of a year, we're talking about. Well, a year. My gosh. What I'm saying is, Your Honor, that on the one hand, you have the two comments. And let's take the one out, because the allegations are en rig, and I'll say en rig, that that was three times. Again, now we are taking this as true for purposes of summary judgment, that it was those three times. The other one, Johnny Mack testified that he was walking by a room. He didn't even see who was in the room. He didn't know who. He said he recognized Patterson's voice. Patterson denies this, but I don't even think that's admissible for him to say I'm walking by. I don't see who it is. It sounds like his voice. And I hear dirty Indians. But let's just throw that in there. Your Honor, we're talking about something that happens at one point in time. It's reported. Nothing happens for a year. Matt Patterson is fixing another machine. Slips and says it. Shouldn't have. But you know what the town did at that point? They suspended the guy for two weeks with no pay. I don't know many people that can go two weeks without a paycheck, and they said two strikes. You didn't raise a remedial work as a defense in this case, did you? Remedial action by the — it wasn't raised. Not as a defense to — because our point is that — Then why mention it? It doesn't have to do with the statements that were made. The plaintiff has indicated that somehow the town was indifferent toward this, and that should somehow contribute to the hostile environment, which it does not. And so — Maybe we ought to move, then, to your argument on retaliation. Because it seems to me, then, there are three instances of retaliation. And talking about the snake incident, because that's the one that your colleague or your opposition put most in front of us, what are you arguing, that this is not an adverse action? Absolutely not, Your Honor. If this is an adverse — Is that your argument? It is. Okay. Then what do I have to show? There must be evidence that the decision-maker knew of the employee's protected activity when the decision was made, right? Yes, and the cases are very clear. And right here we have a co-employee and a supervisor who knows all about this snake accident happening and knows, frankly, that he's already gone to the supervisor above them. At the time of the snake incident? Yes. No, Your Honor. Well, just a minute. What do we have from this testimony giving someone a verbal warning, someone who everybody knew about it and talked because it is a small ground. So whenever something happened, everybody knew about it. What is behind closed doors or not, it was leaked through the grapevine. That's at ER 1171. Whose testimony is that? I don't recall that testimony, Your Honor. Well, that's the testimony of, as I understand it, Davis. And I don't recall that testimony, but it certainly would not have been with regard to whether or not — first of all, I can tell you Davis testified point blank that when he did the snake incident, this was a prank. And I'm going to cover that in just a second. But he had no clue that there had been any complaint whatsoever. And the reality is, Your Honor, the undisputed evidence is that there hadn't been. Johnny Mack went to Councilmember Wessel, which, by the way, that gets to the other issue of the chain of command. This isn't like a normal chain of command, by the way. The town code prohibits town councilmembers from involving themselves in the administrative matters of the town. They're policymakers. This is consistent in most codes I've ever seen in Arizona. So when he's told not to do that, it's because he's got a code provision that says councilmembers aren't supposed to be involving themselves in that. But I want to be able to get to this issue of the snake because Patterson — or, I'm sorry, Davis is the one who does it, testifies. I have not heard anything about any sort of complaint when he does this. He's just doing it as a prank. Now, Johnny Mack, in his deposition, I asked him, what evidence do you have that anybody knew, Patterson, Davis, that those two, who you say were somehow involved in this thing — we know Davis is the one that did it — that they somehow knew that there was any sort of complaint? He said, I don't know. So we can't — it would be beyond speculation. Johnny Mack himself says he doesn't know if they knew anything. So we can't now impute and say, well, they must have, or it was a small town. That may be the case with other things. But they testified expressly. Well, isn't it in the record that Reset and Patterson had a close personal and professional relationship? They worked together. Okay. And, as I said, Davis agreed — this is E.R. 1171 — he agreed giving somebody a verbal warning. Somehow everybody knew about it and talked. It's a small group, so whenever something happened, everybody knew about it. Whether it was behind closed doors or not, it leaked through the grapevine. But, Your Honor, that has nothing to do with Reset going and telling anybody that, oh, Johnny Mack complained to me about X. There is no evidence in the record that that was ever conveyed. With my 20 seconds, I just have to say, Your Honor, because I didn't get to say this. In Arizona, you find — there are garter snakes. It's nonpoisonous. My daughter, who is here with me today, she can't stand butterflies. We like to play jokes on her by putting butterflies around because it scares her. If a nonpoisonous garter snake that harms nobody — But just a minute. Just a minute. You can't go really on that kind of an argument. I've got a law clerk who hates spiders. She won't even take spiders out of her house. So if I went in and put a spider on her desk, I'm not sure it wouldn't be the same thing that we've got here. It might not be a good idea, but, Your Honor, it's not a hostile work environment under the law. Okay. I can understand your argument. Thank you very much. Thank you. All right. You have what? You have 913. Two key points I want to respond to that Your Honor has just covered. First, Johnny Mack never said there are only four. At his deposition, as in many such depths, he was repeatedly asked, name a specific incident, name another. And then he came up with four. He said, there might be more, but I'm not sure at this time. Asked again, he said, I can't name any at this time. And there's testimony from himself and from his doctor that — there's testimony from him at 786 that his memory isn't what it used to be. And at 666, his doctor said, yes, that heart attack can cause weaker memory. Not all heart attacks do, but his heart attack killed a quarter of his heart tissue. So he never said there are only four. And in the Santillan case and the Santos case, page one of our reply, other witnesses can fill in the details plaintiff doesn't remember, if it's the sort of case especially where there aren't a lot of names or a lot of events you didn't see. So in Santillan, plaintiff couldn't remember all the relevant names, but other witnesses are admissible testimony. Here, the relevant testimony is defense admissions. Santos, the same. And finally, knowledge can be inferred from knowledge of others. That's reply — original brief, page 33, and temporal proximity. Thank you very much. We thank you for your argument. And we will submit the case, Mack v. Town of Pinetop Lakeside. Thank you.
judges: Fernandez, Bea, N.R. Smith